UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:16-cv-01789-KLM

JOHN DOE,

        Plaintiff,

      -against-

UNIVERSITY OF COLORADO, BOULDER,
through its Board, THE BOARD OF REGENTS OF THE
UNIVERSITY OF COLORADO, a body corporate,
CHRISTINA GONZALES,
individually and as agent for University of Colorado
Boulder, ALEXANDRA TRACY-RAMIREZ,
individually and as agent for University of Colorado
Boulder, and JESSICA DOTY, individually and as agent
for University of Colorado Boulder.

        Defendants.

_____

AMENDED COMPLAINT AND JURY DEMAND

_____

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff"), by his attorneys Nesenoff &
Miltenberg, LLP and Michael Mirabella, P.C. as and for his Amended Complaint, respectfully
alleges as follows:

**THE NATURE OF THIS ACTION**

1.     This case arises out of the actions taken and procedures employed by Defendants
University of Colorado Boulder through its Board, the Board of Regents of the University of
Colorado ("CU Boulder" or the "University"),  Christina Gonzales ("Defendant Gonzales"),

---

[1] Plaintiff herewith files a motion to restrict access to information contained within the Complaint.

Alexandra Tracy-Ramirez ("Defendant Tracy-Ramirez") and Jessica Doty ("Defendant Doty") (collectively referred to herein as "Defendants") in conducting a biased Title IX investigation concerning false allegations that Plaintiff, a male sophomore at CU Boulder, engaged in nonconsensual sexual activity with Jane Doe 1 and Jane Doe 2, also CU Boulder students. Neither Jane Doe 1 nor Jane Doe 2 filed a complaint against Plaintiff.  Rather, the University approached Jane Doe 1 and Jane Doe 2 and solicited their complaints after an anonymous call was received by former Title IX Coordinator Defendant Gonzales, alleging misconduct on Plaintiff's part.

2.      On April 17, 2014, Plaintiff was summarily suspended, and excluded from campus, by Defendant Gonzales prior to even speaking with Jane Doe 1, Jane Doe 2 or Plaintiff about the allegations.  The suspension was based exclusively on an anonymous phone call received by Defendant Gonzales which accused Plaintiff of sexual misconduct.  After the suspension was implemented, the University failed to provide Plaintiff with any immediate guidance concerning the completion of his classes for the semester—though finals were imminent—or his job as a teaching assistant.

3.      On April 21, 2014, Defendant Tracy-Ramirez spoke with Jane Doe 1, and learned that Jane Doe 1 had no recollection of the events in question, which had occurred approximately eight months earlier. Nonetheless, on the same day, Defendant Tracy-Ramirez emailed a charge letter to Plaintiff which contained a vague description of Jane Doe 1's allegations against him. Despite this paucity of allegations, Defendant Tracy-Ramirez next attempted to pressure Plaintiff into telling his side of the story—informing him that he had one opportunity to speak and no other conversations would be considered as part of his defense.  Plaintiff, who was represented by counsel, refused to speak until he was provided with more information about the charges and

made aware of the exact nature of the allegations against him.  Plaintiff repeatedly expressed that he was willing to cooperate after he was provided with adequate information to properly defend himself.

4.      In response to Plaintiff's request, on May 7, 2014, Defendant Tracy-Ramirez issued a revised charge letter concerning Jane Doe 1's allegations.  However, she continued to deny Plaintiff access to his investigation file.  On May 27, 2014, without having full knowledge of the case against him, Defendant Tracy-Ramirez and the University forced Plaintiff to respond to Jane Doe 1's allegations.  Plaintiff submitted a written statement to Defendant Tracy-Ramirez, in which he denied that any nonconsensual sexual conduct had occurred between himself and Jane Doe 1.

5.      Nearly two months after the anonymous phone call was received, on June 10, 2014, Defendant Tracy-Ramirez issued a second charge letter to Plaintiff, concerning Jane Doe 2's allegations.  This was a result of the investigator's phone conversations with Jane Doe 2, who never met with Defendant Tracy-Ramirez to provide a statement.  Again, the charge letter was vague.  Again, Defendant Tracy-Ramirez forced Plaintiff to respond to the charges without having full knowledge of the details of Jane Doe 2's allegations against him.  Plaintiff submitted a written statement denying the allegations against him.

6.      It was not until July 2, 2014, well after the time for him to respond to both charge letters had passed, that the University permitted Plaintiff and his counsel to review the investigative file.  However, Plaintiff was not permitted to make copies of any of the information contained within that file.  After reviewing the evidence file, Plaintiff submitted a written statement denying all allegations against him.

7.     Defendant Tracy-Ramirez, who was intimidating and obstructive throughout the entire investigation, deemed Plaintiff to be uncooperative and lacking in credibility because he submitted written statements rather than meeting with her in person.  She ignored that CU Boulder's counsel permitted Plaintiff to submit a written defense.

8.     On July 24, 2014, Defendant Tracy-Ramirez issued an investigative report in which she determined that under the standard set forth in CU Boulder's Student Conduct Code (2013-2014) (the "Code")—a "preponderance of information"—it was more likely than not that Plaintiff engaged in nonconsensual sexual intercourse with Jane Doe 1 and Jane Doe 2.  This was despite a complete lack of credible evidence in the file.

9.     Throughout the investigation, it was clear that Defendant Tracy-Ramirez—whose previous career focused on serving as a victim's advocate—presumed Plaintiff to be guilty until proven innocent.  She placed the burden on him to prove his innocence, rather than properly applying the required preponderance of the evidence standard and requiring each Jane Doe to prove that she did not consent.  Equally problematic is CU Boulder's single investigator model, which left Plaintiff's future in the hands of a single, biased individual.  Defendant Tracy-Ramirez was solely responsible for evaluating the witnesses, and the evidence, which ultimately led to Plaintiff's expulsion and a permanent notation on his transcript.

10.     On July 25, 2014, the University's review panel rubber stamped Defendant Tracy-Ramirez's report and the matter was sent to the Director of the Office of Student Conduct ("OSC"), Defendant Doty, to determine what sanction would be imposed.

11.     On August 26, 2014, Defendant Doty emailed a letter to Plaintiff indicating that, as of the date of the letter, he was permanently expelled from CU Boulder (the "Sanction").

12.     A record of the Sanction was placed in Plaintiff's student conduct file.  In cases where, as here, a student is expelled, the University also places a permanent notation on the student's transcript.  Despite the severe impact that an expulsion—and permanent disciplinary record—would have on his education and career prospects, Plaintiff was deprived of the fundamental right to appeal the Sanction.  Indeed, Plaintiff had no right to appeal at any point in the process.  Significantly, had Plaintiff been accused of a Code violation that was unrelated to Title IX, he would have had the right to appeal the decision under CU Boulder's policies.

13.     The single investigator model employed in investigating Plaintiff's case is inherently biased against males accused of sexual misconduct, and has been widely criticized across the country.  This model deprives the accused of the right to a hearing, to confront their accusers, and to cross-examine witnesses.  It also results in arbitrary and capricious sanctions that severely impact the lives, and futures, of those denied due process.

14.     Plaintiff was subjected to a biased and inequitable investigation that deprived him of a meaningful standard of due process and equity.  He was subjected to a process that inherently discriminates against the accused students, who are habitually male.  A non-exhaustive list of Defendants' wrongful actions include: (i) the failure to conduct a thorough and impartial investigation; (ii) evidence of a gender bias against Plaintiff as the male accused throughout the investigation process; (iii) making assessments of credibility and evidentiary weight with respect to each party without any logical basis or rationale; (iv) the failure to afford Plaintiff the presumption of innocence required by the preponderance of the evidence standard; and (v) the issuance of an unwarranted and disproportionate sanction in light of the circumstances, all of which demonstrated substantial procedural errors in violation of Title IX, the Fourteenth Amendment and other federal and/or state laws.

15.     When Defendants subjected Plaintiff to disciplinary action, they did so in an arbitrary and capricious way, violated their own policies, and discriminated against him on the basis of his male sex.  The Code is also inherently discriminatory and insufficient to protect the rights of male students.

16.     The foregoing, coupled with CU Boulder's violations of its own polices during the course of its investigation, combined with its arbitrary and capricious findings has left Plaintiff's future dead in its tracks; namely, he was: unable to complete his studies at CU Boulder; deprived of in state tuition, scholarships, and his teaching assistant position; and forced to hastily transfer to a private school where he paid a significantly higher tuition.  Plaintiff also lost a summer internship position when the potential employer learned the circumstances of his departure from CU Boulder.  Plaintiff's graduate school and future career prospects have been severely compromised due to the permanent notation of expulsion on his transcript and copy of the Sanction in his student conduct file.   His emotional health has also been greatly compromised.  Since the date of his summary suspension on April 17, 2014, Plaintiff has lived in constant fear that his future has been destroyed by the University's biased and unjust adjudication of the unsupported allegations against him.

## THE PARTIES

17.     Plaintiff is a citizen of the United States and a resident of the State of Colorado. During the events described herein, Plaintiff was a student at the University of Colorado Boulder.

18.     The University of Colorado  Boulder is part of the University of Colorado system, with its principal administrative offices in Denver, Colorado.   The University of Colorado

Boulder is authorized, supervised and funded by the State of Colorado pursuant to the Colorado Constitution and Title 23, Article 20 of the Colorado Revised Statutes.

19.     Upon information and belief, the Board of Regents is the governing body of the University of Colorado Boulder. It is composed of nine members and is charged with the general supervision of the university and the exclusive control and direction of all funds of and appropriations to the university, unless otherwise provided by law.

20.     Upon information and belief, Defendant Gonzales is an individual residing in the State of Colorado, and at all relevant times herein, she was a Title IX Co-Coordinator at CU Boulder.

21.     Upon information and belief, Defendant Tracy-Ramirez is an individual residing in the State of Arizona, and at all relevant times herein, Defendant Tracy-Ramirez was the CU Boulder Title IX investigator that CU Boulder assigned to Plaintiff's case.

22.     Upon information and belief, Defendant Doty is an individual residing in the State of Colorado, and at all relevant times herein, Defendant Doty was the head of CU Boulder's Office of Student Conduct ("OSC").

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under the Constitution and laws of the United States and presents a federal question.  This Court further has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a).

24.     Venue is proper in the Denver, Colorado judicial district and division pursuant to 28 U.S.C. 1391(b)(2) because the events giving rise to Plaintiff's claims occurred in this judicial district and division.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.**     **Plaintiff**

25.     Plaintiff began his undergraduate education at CU Boulder in the fall semester of 2012.  He was an honors student, accepted into the prestigious Engineering Leadership program, and a scholarship recipient.  In the spring of 2014, Plaintiff also worked as a teaching assistant for a General Computing class.  He was recommended by faculty for a multi-year company scholarship and internship, which he subsequently won.

26.     Until the spring of 2014, Plaintiff was also a member of a fraternity at CU Boulder.  He lived off campus in fraternity housing.

**II.**     **CU Boulder's Agreement With Plaintiff**

27.     As a term and condition of their attendance at CU Boulder, all students are provided with, and must agree to adhere to, the Code.  In the case of potential Code violations, students have "a duty to cooperate."  Code, Section E.  Failure to meet this duty "may result in a decision being made without the benefit of the student's participation…or may result in a student being charged with failing to comply with the direction of a university official."  *Id.*

28.     The Code "prohibits discrimination and harassment based on membership in a Protected Class" including on the basis of sex.  *Id.*, App. 1.C.1.

29.     The Code provides that the CU Boulder is "committed to providing adequate, reliable and impartial resolutions of complaints."  *Id.*, App.1.D.

30.     The Code states that the "OSC shall resolve…reports or complaints…as promptly as practicable after the report or complaint is made.  Ordinarily, investigations shall be concluded

and investigative reports submitted to the standing review committee no later than 60 days following the receipt of a complaint." *Id.*, App. 1.D.1.

31.    The Code states that "[i]f an investigation is conducted, the conduct officer will send the respondent a notice of investigation which will include a description of the alleged misconduct." *Id.*, App.1.D.3

32.    The Code states that "the complainant and the respondent shall have the right to present relevant information to the investigator…and to receive a copy of the investigator's report at the conclusion of the investigation and appropriate review." *Id.*, App.1.D.3.

33.    Students accused of sexual misconduct are not entitled to a hearing under the Code. *Id.*, App. 1.

34.    The Code provides that "[a]t the conclusion of the investigation, the *investigator* shall prepare a written report that will include a statement of factual findings and a determination as to whether or not there was a violation of the Student Conduct Code….The standard of proof shall be a preponderance of the information."   *Id.* App.1.D.5 (emphasis added).   The "preponderance of the information" standard means that the information contained in the record must "demonstrate that it is more likely than not that the student violated the Student Conduct Code." *Id.*, Section H.4.

35.    A respondent whom the investigator finds to be in violation of the Code's provisions concerning sexual misconduct has no right to appeal the investigator's finding.  *Id.* App. 1.  As set forth in the Code, any student found responsible—by a single investigator—for "violating the provision on nonconsensual sexual intercourse will likely receive a sanction of suspension or expulsion." *Id.*, App.1.D.5 and G.  On the contrary, students found to have committed other offenses, such as assault, streaking, drug possession, or theft, have the right to

an appeal in cases where "sanctions of termination, suspension, or expulsion were imposed." *Id.*, Section K. An appeal in such cases is crucial to *all* students facing expulsion, as, under the Code, "a notation of expulsion remains permanently on the student's transcript." *Id.* Section J.7.

36. Once the investigator issues a report finding that a respondent has violated the Code by committing sexual misconduct, the report is then forwarded to a standing review committee which, in effect, rubber stamps the investigator's findings. *Id.*, App. 1.D.5 and 1.D.6. The standing review committee may not conduct its own investigation or hearing. *Id.*, App.1.D.7.

37. After the standing review committee, the investigative report is forwarded to the OSC Director, who then determines the sanction. At this point, the respondent may meet with the OSC Director, or submit a written statement concerning the sanction, but may not appeal any actions taken by the standing review committee. There is, further, no right to appeal the sanction.

38. The Code leaves the determination of whether those accused of sexual misconduct—who are habitually male—violated the Code to a single individual, the Title IX Investigator. Upon information and belief, at the time that the allegations were investigated against Plaintiff the Title IX investigators were exclusively female and trained to work as victim advocates, creating an inherent bias against a male accused. Male respondents have no right to be heard, confront their accusers, or cross-examine witnesses. Even more damaging is the lack of any right to appeal the investigator's findings, or the sanction. This means that male students accused of sexual misconduct, who are the subject of sexual misconduct allegations at CU Boulder, are certain to face life-altering sanctions without due process.

III.     **The Accusations Against Plaintiff**

39.     On April 15, 2014, Defendant Gonzales received an anonymous phone call in which the caller accused Plaintiff of raping Jane Doe 1 and Jane Doe 2 in separate incidents occurring seven months apart.  Based on this call, Defendant Gonzales immediately suspended Plaintiff and initiated an investigation against him.

A.     **The Alleged Incident With Jane Doe 1**

40.     Jane Doe 1 was contacted by Defendant Tracy-Ramirez and met with the investigator on April 21, 2014.  She told Defendant Tracy-Ramirez that she had been speaking with Jane Doe 2—a friend of hers—over spring break in March 2014, when Jane Doe 2 told Jane Doe 1 that she had a bad experience with Plaintiff.  At that time, Jane Doe 1 shared her "concerns" about Plaintiff with Jane Doe 2.

41.     Jane Doe 1 could not provide Defendant Tracy-Ramirez with a clear account of what happened between herself and Plaintiff.  She learned from friends that she had gone home with Plaintiff.  Prior to the incident, Jane Doe 1 admitted that she had been at a fraternity party and had been drinking.  She did not remember meeting up with the Plaintiff at any point during the party.

42.     The next day, Jane Doe 1 felt like she had engaged in intercourse.  She did not seek medical attention.

43.     Jane Doe 1 stated that she became upset and concerned when she heard that Plaintiff was bragging about having sex with her, including to Jane Doe 1's boyfriend.  Per Jane Doe 1, Plaintiff bragged that he had sex with Jane Doe 1 first, ahead of her boyfriend.

44.     After speaking with Jane Doe 2 over spring break, Jane Doe 1 concluded that she had been raped.  She later heard rumors that Plaintiff talked about having sex with Jane Doe 1, and told people that she said no but he kept going.

45.     Plaintiff denied Jane Doe 1's version of events, and the hearsay accounts concerning consent, stating that he did "not have non-consensual sexual contact and intercourse" with Jane Doe 1 "on or about August 31, 2013 or at any other time, knowing that she lacked the capacity to consent due to her level of intoxication; and I did not have sexual contact or intercourse with her after she repeatedly told me no.  All of those accusations are false, as is any report that I have made statements admitting to doing any of those things."

**B.     The Alleged Incident With Jane Doe 2**

46.     Jane Doe 2 failed to return Defendant Tracy-Ramirez's phone calls for several weeks and did not meet with her in person.  She also did not provide an account of her encounter with Plaintiff.  During the course of her first phone interview, Jane Doe 2 asked Defendant Tracy-Ramirez what information she had about the incident.  Defendant Tracy-Ramirez told Jane Doe 2 that she was named by the president of Plaintiff's fraternity as the individual who had been sexually assaulted by Plaintiff after going to his room, when he forced himself on her.  Defendant Tracy-Ramirez further stated that it was her understanding that Jane Doe 2 told him to stop and he did not.  Jane Doe 2 was understood to be sober at the time.  Jane Doe 2 confirmed this account, and told Defendant Tracy-Ramirez that the incident occurred on March 8, 2014.  Jane Doe 2 later told Defendant Tracy-Ramirez that she wanted to speak with Plaintiff about the incident but this never occurred.  Jane Doe 2 did not meet with the investigator or provide a detailed account of what happened.

47.     Plaintiff denied Jane Doe 2's accusations, stating that he "never had nonconsensual sex with anyone named [Jane Doe 2]."

**IV.     The Actions Taken Against Plaintiff**

48.     On April 15, 2014, Defendant Gonzales, Associate Dean of Students and Title IX Co-Coordinator, received an anonymous call informing her that Plaintiff may have had nonconsensual sex with Jane Doe 1 and Jane Doe 2 in two separate incidents.   The alleged incident with Jane Doe 1 allegedly occurred eight months prior, and the alleged incident with Jane Doe 2 happened approximately 6 weeks prior to the anonymous call.

49.     On April 17, 2014, based solely on the account of the anonymous caller—without speaking to Plaintiff, Jane Doe 1 or Jane Doe 2—and prior to conducting any investigation whatsoever—Defendant Gonzales summarily suspended Plaintiff, excluded him from campus, and prohibited him from contacting Jane Doe 1.   Jane Doe 2, though named by the anonymous caller, was not referenced in the suspension letter provided to Plaintiff.

50.     Jane Doe 1 was not interviewed until April 21, 2014, eight months after the alleged incident, when she met with Defendant Tracy-Ramirez.   During the interview, Jane Doe 1 admitted that she had been drinking on the night of the alleged incident and had no recollection of what actually occurred between her and Plaintiff.

51.     On that same day, before interviewing Plaintiff, Defendant Tracy-Ramirez emailed Plaintiff a Notice of Investigation.   The Notice contained no details concerning Jane Doe 1's allegations against him, and instructed Plaintiff to contact Defendant Tracy-Ramirez to schedule a meeting to be held on or before April 24, 2014.   The notice stated that the meeting would be Plaintiff's opportunity to present his defense—yet he did not know what he was defending himself against.

13

52.     Defendant Tracy-Ramirez ultimately agreed to meet with Plaintiff on April 26, 2014.  Plaintiff and his counsel met with Defendant Tracy-Ramirez and a woman named "Ellen."  Defendant Tracy-Ramirez provided Plaintiff with an oral account of Jane Doe 1's allegations and told him he had one opportunity to respond, at that one-hour meeting.  Defendant Tracy-Ramirez further told Plaintiff that any information that he provided after the meeting would not be considered as part of his defense.  No further information, including the specifics of the charges against him, was provided at this meeting.

53.     On May 1, 2014, Plaintiff's counsel sent a letter to CU Boulder requesting an opportunity to review the contents of the ongoing investigation file, and protesting the manner in which Defendant Tracy-Ramirez was conducting the investigation.

54.     On May 7, 2014, after nearly a month of investigating Jane Doe 1's claims against Plaintiff, Defendant Tracy-Ramirez issued a Revised Notice of Investigation instructing Plaintiff to schedule yet another meeting to respond to Jane Doe 1's allegations against him.  Plaintiff, through his counsel, objected to the meeting request and renewed his request to review the investigative file in order to defend himself against the serious charges against him.

55.     On May 9, 2014, Plaintiff made yet another request to review the investigative file to CU Boulder's counsel.  After several communications between Plaintiff's Counsel and the University's counsel, the University's counsel cut off contact, but first advised Plaintiff that he was required to respond to the Revised Investigation Notice on or before May 27, 2014.

56.     On May 27, 2014, Plaintiff denied Jane Doe 1's allegations as contained within the Revised Notice of Investigation.  At this point, CU Boulder was still refusing to provide him access to the investigative file.

57.     On June 10, 2014—56 days since Defendant Tracy-Ramirez had been alerted to the alleged incident with Jane Doe 2—Plaintiff received a **second** Notice of Investigation concerning Jane Doe 2.  The notice provided only vague allegations and did not identify Jane Doe 2 by her full name.

58.     On June 16, 2014, Plaintiff denied the allegations contained within the second Notice of Investigation via written statement.  CU Boulder continued to deny him access to the investigative file.

59.     On July 2, 2014, nearly three months after the University's investigation began, Plaintiff and his counsel were finally granted access to review the investigative file.  However, they were prohibited from making copies of anything contained within the file.  Even more unconscionable is that Defendant Tracy-Ramirez expected Plaintiff to meet with her on that same day to present his defense.  Plaintiff objected, and was granted a one-week extension.

60.     On July 9, 2014, Plaintiff's counsel sent a written statement to Defendant Tracy-Ramirez in which Plaintiff denied all of the sexual misconduct allegations against him.  In this letter Plaintiff noted the investigator's relentless intimidation tactics, including the prejudicial parameters imposed on his ability to review the investigative file.  Plaintiff further noted that he had been presumed guilty throughout the investigative process, in violation of his right to due process.  Because Plaintiff was denied a hearing, depriving him of the ability to confront his accusers and cross-examine witnesses, he had no choice but to continue to deny the allegations against him through written statements.

61.     On July 24, 2014, over three months after her investigation began, Defendant Tracy-Ramirez issued a report in which she found that it was more likely than not that Plaintiff had raped Jane Doe 1 and Jane Doe 2.  In a muddled opinion riddled with faulty assessments of

credibility and a demonstrated bias against Plaintiff, the investigator concluded that—even though there was no evidence that Plaintiff observed any cues concerning Jane Doe 1's level of intoxication—hearsay witnesses confirmed that Jane Doe 1 did not consent to having sex with Plaintiff. She further concluded, based on hearsay witness testimony, that Jane Doe 2 did not consent to sexual intercourse with Plaintiff. In both cases, Defendant Tracy-Ramirez drew an adverse inference against Plaintiff for failing to meet in person or provide more details about the accusations.

62. Defendant Tracy-Ramirez was the sole arbiter of Plaintiff's fate, and Plaintiff had no right to appeal her decision. Her determination held grievous consequences for Plaintiff, which would permanently impact his future. This decision was rubber stamped by the review panel with lightning speed, as Plaintiff was notified of the panel's confirmation of the report on July 25, 2014. Again, he had no right to appeal.

63. On August 26, 2014, Defendant Doty permanently expelled and excluded Plaintiff from CU Boulder. Yet again, he could not appeal this decision. CU Boulder's counsel also indicated that it would place a permanent notation on his academic transcript, and in his student records, stating that he was found to have violated CU Boulder's Code concerning sexual misconduct. CU Boulder's counsel made it known that the University had an obligation to disclose Plaintiff's propensity for sexual misconduct as a public safety issue.

64. During the course of the investigation, Plaintiff transferred out of CU Boulder. After his transfer, he and CU Boulder entered into an agreement whereby the University agreed not to release his academic records without his permission. The agreement will expire in September 2016. Plaintiff was told by CU Boulder that it intends to maintain the notation on his record concerning his violation of the Code and to release information regarding the violation

without his permission and as it deems necessary.  This will severely impact his future graduate school and career prospects.

**V.     Bias Against Plaintiff as the Male Accused**

65.     Defendants' conduct throughout the investigation demonstrated clear bias against Plaintiff as a male accused.  First, CU Boulder employed an all-female Title IX team, including Defendants Gonzales and Tracy-Ramirez, to investigate the accusations against Plaintiff.

66.     Upon information and belief, Defendant Tracy-Ramirez had an inherent bias against males accused of sexual misconduct.  Her career focus has been in the area of Women's Studies and victim advocacy, including the authorship of papers and presentations on sexual assault and how to support victims of sexual assault.  In one recent article for which she was interviewed, Defendant Tracy-Ramirez's bias against males accused of sexual misconduct was evident.  In discussing how colleges approach parallel misconduct and criminal proceedings, she referred to males accused as "perpetrators" rather than respondents noting that "the 60-day suggested window for colleges to complete a Title IX process…is designed to ensure that officials take steps to help victims and perhaps suspend or expel perpetrators."  *See* S. Brown, *A Sex Assault Case at Brigham Young Puts Honor Codes in the Spotlight*, April 18, 2016, at Bloomberg News.

67.     Defendant Tracy-Ramirez also lacked the experience necessary to adequately conduct a Title IX investigation, as she received investigation training in January 2014—only three months before the investigation against Plaintiff began.

68.     Defendant Tracy-Ramirez demonstrated bias against Plaintiff throughout the investigation.  A non-exhaustive list of her actions include: (i) soliciting complaints against Plaintiff from Jane Doe 1 and Jane Doe 2; (ii) acting in a threatening and intimidating manner

towards Plaintiff when he first met with her, indicating that he had one shot—and one hour—to tell his story; (iii) in comparison, speaking with Jane Doe 1 and Jane Doe 2 on more than one occasion to piece together their stories; (iv) investigating the incident with Jane Doe for nearly two months before providing Plaintiff with a notice of charges; (v) failing to provide Plaintiff with adequate detail concerning Jane Doe 1's charges; (vi) provided Jane Doe 2 with a narrative of what allegedly occurred between Plaintiff and Jane Doe 2, without asking her to provide an account in her own words; (vi) ignoring conduct on the part of Jane Doe 1 indicating that she had consensual sex with Plaintiff; and (vii) drawing an adverse inference against Plaintiff because he submitted written statements denying the accusations against him.

69.     CU Boulder permitted the biased investigation to proceed against Plaintiff without notice, and provided a process by which Defendant Tracy-Ramirez had free reign over the investigation and her determination of the evidence against Plaintiff would be rubber stamped by a review panel.  The University also ensured that the biased findings against Plaintiff would remain intact, as he had no right to a hearing, or an appeal, at any stage of the process.

70.     Significantly, the investigation of Plaintiff's case also took place in the midst of CU Boulder being named by the U.S. Department of Education ("DOE") as one of fifty-five universities and postsecondary schools under investigation by the federal government for mishandling Title IX cases involving sexual violence and sexual harassment.

71.     This external pressure from the federal government certainly motivated Defendants to handle the case against Plaintiff more aggressively, and to protect the reputation and financial well-being of CU Boulder, which was under federal scrutiny. In fact, Defendant Tracy-Ramirez previously acknowledged, "institutions just can't afford to lose money…" *See* E.

Barton, *Sexual Misconduct Not an Obstacle for US-Funded Researchers*, February 11, 2016 at the Daily Caller.

72.     As a result, the Code and process put in place by CU Boulder discriminated against Plaintiff as a male accused. It also discriminates against all respondents accused of sexual misconduct, who are habitually male.

## VI.     The Discriminatory Single Investigator Model

73.     CU Boulder employs the single investigator model, which allows one individual to conduct the entire investigation, make a determination of responsibility and issue a corresponding finding—which a respondent has no right to appeal.  The University's Code does not provide for a hearing on the charges, and the respondent is denied an opportunity to confront his accuser, question any witnesses against him, and present his defense before an impartial decision maker.

74.     The Code states "[a]t the conclusion of an investigation, the investigator shall prepare a written report that will include a statement of factual findings and a determination as to whether or not there was a violation of the Student Conduct Code or university policy.  The standard or proof shall be a preponderance of the information."  Code, App.1.D.5.

75.     The "preponderance of the information" standard means that "[t]he information contained in the record…must demonstrate that it is more likely than not that the student violated the Student Conduct Code." *Id.*, Section H.4.

76.     After the single investigator, the sole arbiter, determines whether an accused has violated the Code, a review panel is employed to sign off on the report.  This panel may not conduct its own investigation or hearing. *Id.*, App. 1.D.7.

77.     Here, the review panel merely rubber stamped Defendant Tracy-Ramirez's report the day after it was issued.  Defendant Tracy-Ramirez conducted a biased investigation, ignored witness motives, drew an impermissible adverse inference against Plaintiff, and relied primarily on hearsay testimony in determining that Plaintiff violated the Code.  All of this was ignored by the panel and the University.  Plaintiff's future was left in the hands of a single individual, and he was stripped of his rights to fair process.

## VII.   The Lack of Credible Evidence Against Plaintiff

78.     Defendant Tracy-Ramirez failed to apply the preponderance of the evidence standard in Plaintiff's case, which ultimately led to an erroneous finding of responsibility. Instead, Plaintiff was presumed guilty from the outset and charged with the task of proving his innocence.   The evidence collected, as cited in Defendant Tracy-Ramirez's investigative report, is completely lacking in credibility.   Defendant Tracy-Ramirez ignored this faulty evidence, including clear indicators of accuser and witness motives to fabricate accusations, in order to pursue a biased case against Plaintiff and reach a predetermined result.

79.     First, Defendant Tracy-Ramirez overlooked the fact that Jane Doe 1 did not file a complaint against Plaintiff.  Defendant Tracy-Ramirez solicited information from Jane Doe 1 after Defendant Gonzalez received an anonymous phone call alleging that Jane Doe 1 and Plaintiff engaged in nonconsensual sexual activity.  When interviewed on April 21, 2014, Jane Doe 1 had no recollection of events that purportedly took place eight months earlier, on August 1, 2013.  This is because Jane Doe 1 was intoxicated on the evening in question.  Jane Doe 1 did not characterize her encounter with Plaintiff as sexual assault until discussing Plaintiff with Jane Doe 2 in March 2014.

80.    Moreover, Defendant Tracy-Ramirez disregarded that Jane Doe 1 had motive to mischaracterize her encounter with Plaintiff—within a few days of having sex with Plaintiff, she started dating Witness 6 ("W6"), one of Plaintiff's fraternity brothers.

81.    W6 admitted in his interview that he was "grossed out" by the thought of Plaintiff and Jane Doe 1 having sex and that he and Plaintiff were not close "for obvious reasons."  W6 also felt that Plaintiff regularly made it a point to bring up the fact that he had sex with Jane Doe 1 before W6.  Thus, the two were rivals in regard to Jane Doe 1.

82.    As noted in Defendant Tracy-Ramirez's report, W6 "exhibited anger" towards Plaintiff.  W6 was also responsible for reporting the incident with Jane Doe 1 to the president of Plaintiff's fraternity, who, in turn, made the anonymous call to Defendant Gonzalez.

83.    Jane Doe 1 had motive to go along with her boyfriend's account and mischaracterize her encounter with Plaintiff in order to gain favor with her "angry," "grossed out" boyfriend.  Moreover, W6 would have had motive to get even with Plaintiff for allegedly flaunting his encounter with Jane Doe 1 in order to compete with W6.  When speaking with Defendant Tracy-Ramirez, W6 noted that Plaintiff made it a point to let him know that Plaintiff slept with Jane Doe 1.  Yet, Defendant Tracy-Ramirez ignored these motives in assessing the credibility of Jane Doe 1 and W6.  After her initial interview with W6, he failed to cooperate with the investigation.

84.    There was one witness, W8, who provided information concerning what happened between Jane Doe 1 and Plaintiff on the night in question.  W8, Plaintiff's fraternity brother, saw Jane Doe 1 emerge from Plaintiff's room, asking for Plaintiff so that he could walk her home.  W8 called Plaintiff, and he walked Jane Doe 1 home.  Defendant Tracy-Ramirez gave no weight to the fact that Jane Doe 1 asked for Plaintiff and permitted him to walk her home.

85.     Per W8, Jane Doe 1 was able to stand and walk on her own, as well as ask W8 for a way home on the night in question.  If she was cogent enough to behave in this manner, then she would also have been able to determine whether she was sexually assaulted.  A person with such suspicions would not wait for her attacker to return to the scene of the alleged crime and take her home.  She would have sought help.  Even if Jane Doe 1 had sensed something was wrong in the days after August 31, 2013, the record makes clear that she did not seek medical attention, or file a complaint.

86.     Astoundingly, Defendant Tracy-Ramirez's report noted that there was *insufficient information available* to determine whether Plaintiff knew or should have known that Jane Doe 1 lacked capacity to consent to sexual intercourse.  There were also no allegations that Plaintiff plied Jane Doe 1 with alcohol, that he knew how much she had been drinking, or that he was aware of her level of intoxication.

87.     Despite this conclusion, Defendant Tracy-Ramirez relied on the first-, second- and third-hand hearsay statements of Plaintiff's fraternity brothers as "incriminating" evidence against Plaintiff.  Most of these witnesses could not clearly recall what they had heard about Jane Doe 1 and Plaintiff, and gave conflicting accounts of what they knew.  The two statements that Defendant Tracy-Ramirez relied on to conclude that Plaintiff raped Jane Doe 1, were provided by W8 and W9.

88.     During his interview, W8 appeared reluctant to answer open-ended questions, but opened up when asked "specific" questions.  This is telling, as it indicates that Defendant Tracy-Ramirez had to ask W8 leading questions in order to get the answers she wanted.  There is no method for double checking this technique as witnesses did not provide statements in their own words, nor were the interviews recorded.  According to Defendant Tracy-Ramirez, W8 said that

Plaintiff made some vague statement at a party which indicated to W8 that when Plaintiff had sex with Jane Doe 1, she had told him not to continue and, at the same time, to slow down. According to W8, Plaintiff further said Jane Doe "wouldn't go like he wanted her to" but they had sex anyway.  These inconsistent, vague, statements—allegedly made at an imprecise time, potentially months after the night in question at a party where the witnesses admitted they were drinking—were the sole evidence used by Defendant Tracy-Ramirez to conclude that Jane Doe 1 did not consent to sexual intercourse with Plaintiff.

89.    W9, another witness (and fraternity brother) who refused to cooperate without the assistance of leading questions, was directly asked if he remembered a conversation that he and W8 may have had with Plaintiff at a party.  W9 said he had not been a direct part of the conversation, but had been "listening" to the discussion between W8 and Plaintiff.  W9 could not remember exactly what Plaintiff said but it was something to the effect of "no" and that it hurt. Again, Defendant Tracy-Ramirez used this "reliable witness" information to conclude that Jane Doe did not consent to sexual intercourse with Plaintiff.

90.    Defendant Tracy-Ramirez ignored the potential motives of Plaintiff's fraternity brothers to come forward and implicate Plaintiff in order to avoid trouble for the fraternity. Because the investigator had blinders on she also failed to adequately investigate whether any rivalry existed amongst the fraternity brothers, including whether any of the witnesses had any reasons to want to cause trouble for Plaintiff.  The fraternity's willingness to abandon its brother was quite evident—shortly after Jane Doe 1 was interviewed, the fraternity contacted its management company and terminated Plaintiff's lease.  The management company's representative told Plaintiff's father that the fraternity had informed him that Plaintiff would not be attending CU Boulder in the upcoming year.

91.     Plaintiff denied Jane Doe 1's accusations against him, including the allegation that he told anyone that he had nonconsensual sexual intercourse with Jane Doe 1.  He did so via written statements, which Defendant Tracy-Ramirez held against him in assessing his credibility, noting he "elected to provide brief written statements rather than participate in a substantive conversation about the allegations."  The University's counsel told Plaintiff he could provide a written statement in his defense.  Defendant Tracy-Ramirez discounted Plaintiff's denials, instead favoring the testimony she had elicited from witnesses with ulterior motives.

92.     Jane Doe 2 did not file a complaint.  Like Jane Doe 1, the University contacted her in response to an anonymous phone call.  Jane Doe 2 was also a reluctant witness.  She never appeared in person to give a statement and it took Defendant Tracy-Ramirez several attempts to get in touch with her via telephone.  Jane Doe 2 did not seek medical attention or file a complaint.

93.     When Defendant Tracy-Ramirez did speak to Jane Doe 2 on the phone, she did not have much to say about what happened with Plaintiff.  Defendant Tracy-Ramirez simply recited an account to Jane Doe 2 of what she had heard from other witnesses.  The investigator discounted Jane Doe 2's reluctance as concern over damaging her reputation and friendships. She also took Jane Doe 2's silence on the other end of the phone as an indication that she had been crying.  A review of Defendant Tracy-Ramirez's notes in this regard show clear bias against Plaintiff.  Jane Doe 2 even asked Defendant Tracy-Ramirez how she could have moved forward without having the full story.

94.     Jane Doe 2, who was sober on the night in question, should have been the key witness in the investigation against Plaintiff.  Instead, she only spoke briefly with Defendant Tracy-Ramirez on three, separate phone calls.  She also seemingly refused to cooperate with the

investigation.  These facts were completely ignored in assessing the credibility of Jane Doe 2, and, again Defendant Tracy-Ramirez relied on hearsay statements to prove her case.  At one point, Jane Doe 2 expressed an interest in speaking with Plaintiff because she believed he did not understand what he did.  Defendant Tracy-Ramirez failed to explore this subject with Jane Doe 2 or further investigate the purported misunderstanding.

95.     Plaintiff denied that he had nonconsensual sex with Jane Doe 2.  Once again, Defendant Tracy-Ramirez dismissed his denial as not being credible because he did not meet with her in person.

96.     Plaintiff's rights were egregiously violated through CU Boulder's biased investigation process.   Defendants failed to conduct an equitable investigation; solicited complaints from Jane Doe 1 and Jane Doe 2; left the determination of whether Plaintiff violated the Code in the hands of a single, biased individual, Defendant Tracy-Ramirez; failed to provide Plaintiff with sufficient notice of the charges against him; began its investigation before notifying Plaintiff of the charges against him; failed to conduct a timely investigation; refused Plaintiff access to the investigation file until after the deadline to respond to the charges against him; and denied Plaintiff the right to a hearing or an appeal.  As a result of CU Boulder's violations of its own policies and procedures, and Plaintiff's due process rights, Plaintiff now faces irreparable harm to his future and reputation, as CU Boulder has permanently marked Plaintiff's expulsion on his transcript and maintained a copy of the Sanction in his student conduct file.

97.     CU Boulder's decision should be reversed, his transcript should be restored, and academic record expunged.  CU Boulder should also compensate Plaintiff for its serious violations of Title IX and the United States Constitution, its flagrant breaches of promises made

to Plaintiff when he agreed to attend CU Boulder, all of which caused severe emotional distress,

financial injuries, and other direct and consequential damages.

## COUNT I
### Violation of Title IX of the Education Amendments of 1972
**(Against Defendant University of Colorado Boulder, through its Board, the Board of Regents of the University of Colorado)**

98.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set

forth herein.

99.     Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) ("Title IX"),

provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or be subjected to
> discrimination under any education program or activity receiving Federal
> financial assistance.

100.     Title IX applies to an entire school or institution if any part of that school receives

federal funds; hence, athletic programs are subject to Title IX, even though there is very little

direct federal funding of school sports.

101.     For its 2014 fiscal year, CU Boulder received $156,916,000 in federal funding for

research and development.  In the prior fiscal year, 2013, CU Boulder received $161,868,000 in

federal funding for research and development.  *See* University of Colorado Annual Report, FY

2015, *available at* https://www.cu.edu/controller/fy-2015-annual-report-pdf-version.

102.     Both the Department of Education ("DOE") and the Department of Justice have

promulgated regulations under Title IX that require a school to "adopt and publish grievance

procedures providing for the prompt and equitable resolution of student…complaints alleging

any action which would be prohibited by" Title IX or the regulations thereunder.  34 C.F.R.

§ 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[2]

103.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved."[3]

104.    The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice…of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment…";

- "Adequate, reliable and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint…"[4]

105.    Title IX also obligates schools to make sure that all employees involved in the conduct of the procedures have adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."[5]

106.    Since June 2013, CU Boulder has been under investigation by the DOE's Office of Civil Rights ("OCR") for mishandling sexual assault cases.  On May 1, 2014—during the time in which the University was investigating the accusations made against Plaintiff—the OCR

---

[2] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001) at 19-20, 21 & nn. 98-101.
[3] *Id.* at 22 (emphasis added).
[4] *Id.* at 20.
[5] *Id.* at 21.

announced in a press release that CU Boulder was the subject of a Title IX investigation.  Upon information and belief, that investigation is ongoing.

107.    The Code put in place by CU Boulder deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection.   The Code discriminates against all respondents, who are habitually male.  Specifically:

- The Code permits the University to investigate complaints against respondents before providing them with notice of the charges against them;

- A single, typically female, investigator is responsible for conducting the investigation against the respondent, assessing the credibility of the witnesses, and determining whether the evidence demonstrates by "a preponderance of information" whether the respondent violated the Code;

- A review panel rubber stamps the investigator's findings and is prohibited from conducting its own investigation;

- No hearing is held.  Respondents are denied the right to confront their accusers, cross-examine witnesses and put on their own evidence and testimony;

- Respondents are denied the right to examine the evidence in the investigator's file until after the Title IX investigator determines whether a Code violation has occurred;

- The Director of the University's Office of Student Affairs singlehandedly decides the sanction to be imposed against the respondent; and

- The respondent has no right to an appeal at any point in the process.

108.    Upon information and belief, the University's Title IX investigator, Defendant Tracy-Ramirez, lacked the experience necessary to conduct the investigation against Plaintiff as she had taken Title IX training only 15 months prior to conducting the investigation against Plaintiff.   She was not taught how to conduct an investigation until three months prior to conducting the investigation against Plaintiff.  Upon information and belief, Defendant Tracy-Ramirez was also inherently biased as an investigator as the focus of her work at CU Boulder

was as an advocate for victim's rights.   Defendant Tracy-Ramirez also has a background in Women's Studies.

109.   Defendants also failed and/or refused to follow its existing policies and procedures when investigating the charges against Plaintiff.   Specifically, Defendants:

- Imposed the severe, preliminary sanction of a temporary suspension and exclusion on Plaintiff on the basis of statements made in an anonymous phone call and before Jane Doe 1 even made a complaint against Plaintiff;

- *Solicited* complaints from Jane Doe 1 and Jane Doe 2 based on an anonymous phone call;

- Investigated the allegations against Plaintiff before providing him with notice of the charges against him;

- In the case of Jane Doe 1, failed to notify Plaintiff of the specific allegations against him for nearly a month;

- In the case of Jane Doe 2, conducted an investigation of the charges against Plaintiff for a period of 56 days prior to serving a notice of the charges on Plaintiff;

- Refused to provide Plaintiff with access to the investigation file so that he could respond to the allegations against him in a meaningful way;

- Permitted the female investigator, Defendant Tracy-Ramirez, to advocate for the accusers throughout the process, intimidate Plaintiff, and attempt to force him to tell his side of the story before any notice of the charges against him was provided;

- Permitted Defendant Tracy-Ramirez to make an adverse inference against Plaintiff because he submitted a written statement denying the allegations; and

- Issued the Sanction over four months after the investigation against Plaintiff began, with no right to appeal.

110.   CU Boulder's existing practices and procedures discriminate, on the basis of sex, against the male accused, including Plaintiff.   CU Boulder conducted its investigation of the allegations against Plaintiff in a manner that was slanted in favor of the female accusers.

Defendant Tracy-Ramirez solicited complaints from Jane Doe 1 and Jane Doe 2. Jane Doe 1 had no recollection of the events in question. Jane Doe 2, who was interviewed over the phone, did not provide her own account of what allegedly occurred with Plaintiff. Instead, Defendant Tracy-Ramirez provided Jane Doe 2 with a narrative of what Tracy-Ramirez believed happened. Plaintiff was never provided with a meaningful opportunity to be heard. Defendant Tracy-Ramirez told Plaintiff he had one shot to provide her with his side of the story—before he was even aware of the charges against him.

111. CU Boulder shut Plaintiff out of the CU Boulder community without allowing Plaintiff an adequate opportunity to review and contest the specific allegations against him, without conducting a fair and equitable investigation, and without a hearing. From the moment that Defendant Gonzalez received the anonymous phone call implicating Plaintiff, CU Boulder treated him as "guilty."

112. CU Boulder erroneously placed the entire burden on Plaintiff to prove his innocence, instead of setting forth competent evidence to demonstrate how Plaintiff allegedly engaged in non-consensual sex with either Jane Doe 1 or Jane Doe 2.

113. CU Boulder's policies effectuate a denial of due process for the student population, especially the male student population, because they are set up to encourage and facilitate false reports of sexual misconduct and/or other grievances without any recourse for the falsely accused.

114. CU Boulder's policies and procedures disproportionately affect the male population of the CU Boulder community as a result of the higher incidence of female complainants of sexual misconduct versus male complainants of sexual misconduct.

115.   CU Boulder has created an environment in which an accused male student is effectively denied fundamental due process by being prosecuted through the conduct process under the cloud of a presumption of guilt.  This one-sided process deprived Plaintiff, as a male student, of educational opportunities at CU Boulder on the basis of his sex.

116.   CU Boulder imposed sanctions on Plaintiff without conducting a fair, impartial investigation and without evidence that he engaged in non-consensual sex with either Jane Doe 1 or Jane Doe 2.  As a result, Plaintiff faces a permanent notation on his CU Boulder transcript labeling him a sexual predator, even though he was never given an opportunity for notice and a fair hearing.

117.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT II**
**Violation of the Fourteenth Amendment of the United States Constitution**
**Procedural Due Process**
**(Against Al Defendants)**

118.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

119.   On April 4, 2011, the United States, by and through its agent, the DOE, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX" ("Dear Colleague Letter").

120.   Reversing previous federal policy, the Dear Colleague Letter threatened colleges and universities with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under detailed procedures and terms dictated by the federal government.

121.    As a result of the Dear Colleague Letter and later statements, actions, and directives issued by the United States, colleges and universities were required to:

- Investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

- Establish a coordinated and centralized investigative and adjudicative procedure according to detailed rules mandated by the federal government and headed by a Title IX coordinator;

- Protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

- Apply a preponderance of the evidence standard when adjudicating such allegations (whereas previously colleges and universities frequently applied higher evidentiary standards, such as the clear and convincing evidence standard);

- Prohibit accused students from cross-examining witnesses; and

- Expel students found to have engaged in nonconsensual sexual intercourse with other students.

122.    Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter.  For example, in July 2014, while CU Boulder was investigating the accusations against Plaintiff, DOE Assistant Secretary for Civil Rights Catherine Lhamon stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter.  "Do not think it's an empty threat."  Lhamon warned.  At the time that this edict was issued, CU Boulder was under investigation by the OCR for mishandling sexual assault cases.

123.    Upon information and belief, since the OCR opened its investigation against CU Boulder in June 2013, the number of male students expelled—including Plaintiff—has increased considerably.

124.    Upon information and belief, CU Boulder acted in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to extremely substantial, indeed crippling, monetary penalties.

125.    In fact, demonstrating its attempted compliance with the 2011 Dear Colleague Letter, CU Boulder's 2015 Clery Report annual disclosure of crime statistics reveals that the number of forcible sex offenses investigated yearly between 2010 and 2014 quadrupled, from 4 instances of sexual assault on campus in 2010 to 16 instances of sexual assault reported in 2014.

126.    Accordingly, CU Boulder was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter and by subsequent federal actions, statements, and directives.

127.    CU Boulder applied the investigative and adjudicatory process dictated to it by the federal government when it investigated and adjudicated the complaints against Plaintiff.

128.    Under clear and controlling case law, a private actor required by the United States to investigate and adjudicate the violations of a federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such investigation and adjudication.

129.    When CU Boulder investigated and adjudicated the complaints made by Jane Doe 1 and Jane Doe 2 against Plaintiff, and when it expelled Plaintiff, CU Boulder was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

130.    In the course of CU Boulder's investigation and adjudication, CU Boulder flagrantly violated Plaintiff's clearly established rights under the Due Process clause of the

Fourteenth Amendment through its repeated acts of gender bias and deprivation of the minimal requirements of procedural fairness.  Without limitation, such acts included the following:

- Suspending Plaintiff before a complaint was filed by either Jane Doe 1 or Jane Doe 2;

- Soliciting complaints from Jane Doe 1 and Jane Doe 2;

- Investigating the accusations concerning Jane Doe 1 for nearly a month before providing Plaintiff with notice of the charges;

- Investigating the accusations concerning Jane Doe 2 for nearly two months before providing Plaintiff with notice of the charges;

- Denying Plaintiff and his counsel access to the investigative file until nearly three months after Jane Doe 1's complaint was made against him.  When he was provided access, he could not copy any of the information in the file;

- Allowing Defendant Tracy-Ramirez to intimidate Plaintiff, while serving as an advisor and advocate for Jane Doe 1 and Jane Doe 2;

- Allowing Defendant Tracy-Ramirez to draw an adverse inference against Plaintiff for submitting written statements concerning his defense, while Jane Doe 2 also failed to appear in person;

- Denying Plaintiff a hearing, and the right to confront his accusers, present evidence, or cross-examine witnesses;

- Leaving the evaluation of the credibility of the witnesses, the weight of the evidence, and the determination as to whether Plaintiff violated the Code to the sole discretion of Defendant Tracy-Ramirez, a biased investigator;

- Issuing a severe sanction in response to Defendant Tracy-Ramirez's sole determination that Plaintiff violated the Code; and

- Denying Plaintiff the right to appeal any portion of the process, including his expulsion from the University on August 26, 2014.

131.    Based on the foregoing, CU Boulder was a state actor when it violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the sexual assault complaints against Plaintiff.

132.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT III
## Breach of Contract
**(Against Defendant University of Colorado Boulder, through its Board, the Board of Regents of the University of Colorado)**

133.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

134.     Based on the aforementioned facts and circumstances, CU Boulder created express and implied contracts when Plaintiff accepted an offer of admission to CU Boulder and paid tuition and fees.

135.     Based on the foregoing facts and circumstances, CU Boulder breached express and implied agreement(s) with Plaintiff.

136.     CU Boulder committed several breaches of its agreements with Plaintiff during the investigation process.  A non-exhaustive list of CU Boulder's breaches include the following:

**A.     CU Boulder Failed To Conduct An Equitable Investigation**

137.     The Code states that, in sexual misconduct cases, it "is intended to provide procedural equity to both parties throughout the Student Conduct process."  Code, Section H.6, at p. 7.

138.     CU Boulder breached its contract with Plaintiff by failing to provide procedural equity: i) Defendant Gonzalez suspended Plaintiff before she even established the anonymous caller's accusations against him (or even spoke with either Jane Doe 1 or Jane Doe 2); ii) Defendant Tracy-Ramirez conducted an investigation of the accusations against Plaintiff for months without notifying him of the charges against him; iii) Plaintiff's accusers were given more than one opportunity to tell their stories to Defendant Tracy-Ramirez, who coached and

35

comforted both throughout the process—Plaintiff was intimidated and forced to provide a defense without having all the facts about the accusations against him; iv) Plaintiff was denied access to the investigative file for months; and v) Jane Doe 2 was not required to appear in person to discuss her complaint while Defendant Tracy-Ramirez drew an adverse inference against Plaintiff for failing to tell his story in person.

**B.      CU Boulder Discriminated Against Plaintiff on the Basis of Sex**

139.    The Code "prohibits discrimination and harassment based on membership in a Protected Class" including on the basis of sex.  Code, App. 1.C.1.

140.    As set forth, *supra*, paragraphs 65-76, CU Boulder breached its contract with Plaintiff because it conducted its investigation of the allegations against Plaintiff in a manner that was biased against him.  Through Defendant Tracy-Ramirez biased investigation, which was slanted in favor of Plaintiff's accusers, CU Boulder engaged in sex-based discrimination against Plaintiff.

**C.      CU Boulder Failed to Resolve the Complaints Impartially**

141.    The Code provides that the CU Boulder is "committed to providing adequate, reliable and impartial resolutions of complaints."  Code, App.1.D.

142.    Here, CU Boulder breached its contract with Plaintiff when Defendant Tracy-Ramirez conducted an intimidating, forceful, and biased investigation in which she: i) took the statements of Jane Doe 2 as truth despite her reluctance to participate in the investigation; ii) relied on the statements of hearsay witnesses to piece together the events concerning Jane Doe 1, who had no recollection of what occurred nearly 8 months prior; iii) solicited complaints from Jane Doe 1 or Jane Doe 2 based on an anonymous phone call; iv) drew an adverse inference

against Plaintiff for submitting a written statement; and v) misapplied the "preponderance of the information" standard.

### D.     CU Boulder Failed to Promptly Resolve the Complaints

143.    The Code states that the "OSC shall resolve these reports or complaints…as promptly as practicable after the report or complaint is made.  Ordinarily, investigations shall be concluded and investigative reports submitted to the standing review committee no later than 60 days following the receipt of a complaint."  Code, App. 1.D.1.

144.    Here, CU Boulder breached its contract with Plaintiff by failing to conduct a prompt investigation of the allegations against him.  Defendant Gonzalez received the anonymous call on April 15, 2014.  Jane Doe 1's complaint was made on April 21, 2014.  Defendant Tracy-Ramirez first spoke with Jane Doe 2 on May 2, 2014.  The investigation was not concluded until well over three months after the first report, on July 24, 2014.

### E.     CU Boulder Failed to Notify Plaintiff of the Allegations Against Him

145.    The Code states that "[i]f an investigation is conducted, the conduct officer will send the respondent a notice of investigation which will include a description of the alleged misconduct."  App.1.D.3.

146.

CU Boulder breached its contract with Plaintiff by failing to follow this procedure.  In the case of Jane Doe 1, the first notice of investigation provided to Plaintiff failed to provide adequate notice of the allegations against him.  In the case of Jane Doe 2, Defendant Tracy-Ramirez conducted an investigation for 56 days before providing Plaintiff with notice that the investigation was underway.  Once he received the Notice of Investigation, it did not even contain Jane Doe 2's full name.

**F.     CU Boulder Did Not Afford Plaintiff a Meaningful Opportunity to Respond to the Allegations Against Him**

147.    The Code states that "the complainant and the respondent shall have the right to present relevant information to the investigator…and to receive a copy of the investigator's report at the conclusion of the investigation and appropriate review."  App.1.D.3.

148.    CU Boulder breached its contract with Plaintiff by failing to provide him with a meaningful opportunity to respond to the allegations against him, or present relevant information to the investigator—Plaintiff was not permitted to review any of the evidence against him until nearly three months after the investigations began.   Essentially, Defendant Tracy-Ramirez attempted to force him to submit a response to the accusations, and prepare a defense, before he was even allowed to review the details of the case alleged against him.

**G.     CU Boulder Failed To Apply the Proper Burden of Proof**

149.    The Code provides that "[a]t the conclusion of the investigation, the investigator shall prepare a written report that will include a statement of factual findings and a determination as to whether or not there was a violation of the Student Conduct Code….The standard of proof shall be a preponderance of the information."   App.1.D.5.   The "preponderance of the information" standard means that the information contained in the record must "demonstrate that it is more likely than not that the student violated the Student Conduct Code."   Code, Section H.4.

150.    CU Boulder breached its agreement with Plaintiff because Defendant Tracy-Ramirez failed to utilize the preponderance of information standard when reaching her decision. A fair reading of the evidence reveals that Jane Doe 1 could not recall the events in question—which had occurred 8 months prior to the investigation—because she was intoxicated at the time. Defendant Tracy-Ramirez, therefore, relied on hearsay statements made by witnesses who

subsequently learned of the incident from Jane Doe 1, many of whom, including her boyfriend, had motive to be untruthful.  Defendant Tracy-Ramirez never received a firsthand account from Jane Doe 2.  Instead, she provided Jane Doe 2 with a predetermined account of the events in question in a brief phone call.  Again, Defendant Tracy-Ramirez relied on hearsay statements made by others.  Defendant Tracy-Ramirez also drew an adverse inference against Plaintiff for failing to share his defense in person.  Based on the foregoing, Defendant Tracy-Ramirez improperly placed the burden of proof on Plaintiff to establish that he was innocent of the charges against him.

151.    As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, financial injuries, and other direct and consequential damages.

152.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT IV**
**Breach of the Covenant of Good Faith and Fair Dealing**
**(Against Defendant University of Colorado Boulder, through its Board, the Board of Regents of the University of Colorado)**

153.    Plaintiff repeats and realleges every allegation hereinabove as if fully set forth herein.

154.    Based on the aforementioned facts and circumstances, CU Boulder breached and violated the covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff by meting out the disproportionately severe sanction of expulsion where there was a lack of credible evidence concerning the claims against him.

155.    As a direct, reasonable and foreseeable consequence of this breach, Plaintiff sustained damages, including, without limitation, emotional distress, economic injuries, the

inability to complete his studies at CU Boulder, impact on his future career and higher education prospects, and other direct and consequential damages.

156.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT V**
**Estoppel and Reliance**
**(Against Defendant University of Colorado, Boulder, through its Board, the Board of**
**Regents of the University of Colorado)**

157.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

158.     CU Boulder's various policies constitute representations and promises that CU Boulder should have reasonably expected to induce action or forbearance by Plaintiff.

159.     CU Boulder expected or should have reasonably expected Plaintiff to accept its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises that CU Boulder would not tolerate, and Plaintiff would not suffer, harassment by fellow students, and would not deny Plaintiff his procedural rights should he be accused of a violation of CU Boulder's policies.

160.     Plaintiff relied to his detriment on these express and implied promises and representations made by CU Boulder.

161.     Based on the foregoing, CU Boulder is liable to Plaintiff based on estoppel.

162.     As a direct, reasonable and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including without limitation, emotional distress, economic injuries, the inability to complete his studies at CU Boulder, and other direct and consequential damages.

163.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT VI
### Declaratory Judgment
### (Against All Defendants)

164.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

165.     CU Boulder has committed numerous violations of the Parties' contracts and of federal and state law.

166.     Plaintiff's future has been severely compromised and damaged.   Without appropriate redress, the Sanction imposed as a result of CU Boulder's biased investigation will continue to cause irreversible damage to Plaintiff's educational, career, and future employment prospects, with no end in sight.

167.     As a result of the foregoing, there exists a justiciable controversy between the parties with respect to the outcome, permanency and future handling of Plaintiff's formal student record at CU Boulder.

168.     By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by Defendant Tracy-Ramirez be reversed; (ii) the Sanction be reversed; (iii) Plaintiff's reputation be restored; (iv) Plaintiff's disciplinary record be expunged; (v) the record of Plaintiff's expulsion be removed from his education file; (vi) any and all records pertaining to the investigation be destroyed; and (vii) CU Boulder's Code is unconstitutional as applied.

### PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against CU Boulder as follows:

(i)     on the first count for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at CU Boulder, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(ii)    on the second count for violation of the Fourteenth Amendment of the United States Constitution, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at CU Boulder, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iii)   on the third count for breach of contract, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at CU Boulder, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iv)    on the fourth count for breach of the covenant of good faith and fair dealing, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at CU Boulder, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(v)     on the fifth count for estoppel and reliance, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at CU Boulder, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(vi)    on the sixth count for a declaratory judgment pursuant to 28 U.S.C. § 2201, a declaration that (i) the outcome and findings made by Defendant Tracy-Ramirez be reversed; (ii) the Sanction be reversed; (iii) Plaintiff's reputation be restored; (iv) Plaintiff's disciplinary record be expunged; (v) the record of Plaintiff's expulsion be removed from his education file; (vi) any and all records pertaining to the investigation be destroyed; and (vii) CU Boulder's Code is unconstitutional as applied.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:
       September 16, 2016

                                     **Michael Mirabella P.C.**

By:        _____
                                    Michael J. Mirabella, Esq.
                                    420 East 17th Avenue, Suite 400
                                    Denver, CO 80203
                                    720-931-2094
                                    mmirabella@mbellalaw.com

                                      -and-

                                    **NESENOFF & MILTENBERG, LLP**

                                    */s/ Andrew T. Miltenberg*
                                    *[ e-filing – September 16,2016]*

                                    Andrew T. Miltenberg, Esq.
                                    Tara J. Davis, Esq.
                                    Nesenoff & Miltenberg LLP
                                    363 7th Avenue, Fifth Floor
                                    New York, NY  10001
                                    212-736-4500
                                    amiltenberg@nmllplaw.com
                                    tdavis@nmllplaw.com
                                    Counsel for Plaintiff