**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-1789-WJM-KLM

JOHN DOE,

    Plaintiff,

v.

PHILIP DISTEFANO, in his official capacity as Chancellor of the University of Colorado, Boulder,

    Defendant.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff was expelled from the University of Colorado at Boulder ("the University," unless the context requires otherwise) in August 2014 after the University's Title IX office concluded that he had sexually assaulted two female students in separate incidents. Plaintiff filed this suit about six weeks before his expulsion, before the University's investigator had reached any conclusions. (ECF No. 1.)

The Court has previously issued two extensive orders in this case resolving motions to dismiss. *See Doe v. Univ. of Colo.*, 255 F. Supp. 3d 1064 (D. Colo. 2017) (ECF No. 91) ("*Doe I*"); *Doe v. DiStefano*, 2018 WL 2096347 (D. Colo. May 7, 2018) (ECF No. 133) ("*Doe II*"). These orders have narrowed the issues here to one claim—violation of procedural due process—asserted against one defendant, Philip DiStefano, Chancellor of the University. DiStefano ("Defendant") is the appropriate defendant to name under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), in light of the relief Plaintiff requests. Specifically, Plaintiff requests that the Court order Defendant to purge

an adverse notation from Plaintiff's University transcript. (ECF No. 102.)

This case is set for a bench trial to begin on July 22, 2019. Currently before the Court is Plaintiff's Motion for Summary Judgment. (ECF No. 112.) For the reasons explained below, the Court denies the motion.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. PROCEDURAL MATTERS

The undersigned's Revised Practice Standards impose the following requirement on a summary judgment movant:

> All motions for summary judgment . . . must contain a
> section entitled "Movant's Statement of Material Facts." This

> Statement shall set forth in simple, declarative sentences, all of which are separately numbered and paragraphed, each material fact the movant believes supports movant's claim that movant is entitled to judgment as a matter of law. Each statement of fact must be accompanied by a specific reference to supporting evidence in the record.

WJM Revised Practice Standard III.E.3. Plaintiff's first statement of fact, however, is as follows:

> This Court is well versed in the facts of this case, and as stated in its order dated May 7, 2018 [*Doe II*], provided "an extensive account of the relevant factual allegations" in its order dated May 26, 2017 [*Doe I*], which are hereby incorporated by reference in the interest of judicial efficiency.

(ECF No. 161 at 3, ¶ 1.)[1] Plaintiff then goes on to set forth "a requisite brief summary of the relevant undisputed facts," many of which are argumentative interpretations of supposedly undisputed facts (not simple, declarative sentences), sometimes supported by nothing more than this Court's *Doe I* summary of Plaintiff's *allegations* (not citations to evidence in the record). (*Id.* at 3–5.)

Defendant, by contrast, sets forth simple statements of fact that he deems relevant to the Court's disposition, supported by competent evidence. (ECF No. 168 at 6–10.) Plaintiff, in reply, either admits these statements or refuses to either admit or deny, adding that none of Defendant's assertions are "material" to the motion. (ECF No. 175 at 5–8.)

The undersigned's Revised Practice Standards do not permit a refusal to admit or deny. *See* WJM Revised Practice Standards III.E.4 & .6(b). Accordingly, all of Defendant's factual assertions are deemed admitted—and, contrary to Plaintiff's

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits with cover pages.

3

assertion, most of Defendant's assertions *are* material. By necessity, the Court draws the bulk of the facts, below, from Defendant's statement, as supplemented by the handful of helpful, undisputed factual assertions from Plaintiff's motion and a few gap-filling (and apparently undisputed) details drawn from prior orders.

### III. FACTS

On April 15, 2014, Plaintiff's fraternity president called Christina Gonzalez, then "the Associate Vice Chancellor of Dean of Students," to convey reports that Plaintiff had engaged in sexual misconduct. (ECF No. 168 at 6, ¶ 1.) Gonzalez opened a Title IX investigation and immediately suspended Plaintiff. (ECF No. 161 at 3, ¶¶ 3, 6.)

"[Alexandra] Tracy-Ramirez, a Title IX investigator for the University, was assigned to investigate the allegations against Plaintiff." *Doe I*, 255 F. Supp. 3d at 1070. Per University policy, Tracy-Ramirez would be the single investigator, who would both investigate the accusations and make conclusions based on a preponderance-of-the-evidence standard. (ECF No. 161 at 4, ¶ 9.)

Tracy-Ramirez issued a Notice of Investigation to Plaintiff on April 21, 2014, explaining that he had been accused of "engag[ing] in non-consensual sexual contact and/or intercourse with a female student" on August 31, 2013. (ECF No. 168-1 at 2.) Soon after, Plaintiff applied to transfer to a different university ("Transfer University"). (ECF No. 168 at 6, ¶ 4.)

On May 7, 2014, Tracy-Ramirez issued a revised Notice of Investigation to Plaintiff, providing more details, including the alleged victim's name (to whom the Court will refer as "Jane Doe 1"), the alleged circumstances (an alcohol-laden fraternity party), and a short summary of the evidence against him (reports of Jane Doe 1's level of

4

intoxication on the night in question, reports from those who watched Plaintiff leave the party with Jane Doe 1, and reports that Plaintiff had been heard bragging about having sex with Jane Doe 1 despite her protests). (*Id.* at 4.)

On June 10, 2014, Tracy-Ramirez issued a Notice of Investigation to Plaintiff with information about an alleged assault on a second female student ("Jane Doe 2") on March 9, 2014. (*Id.* at 7.)

During her investigation, Tracy-Ramirez spoke with Jane Doe 1, Jane Doe 2, seven male student witnesses who were members of Plaintiff's fraternity, and three female witnesses who were friends with either Jane Doe 1 or 2, or both. (ECF No. 168 at 7, ¶ 8.) Jane Doe 1 told Tracy-Ramirez that she had little memory of the night in question other than briefly waking up naked and not in her own bed. (*Id.* ¶ 9.) But she woke up in her own bed the next morning and could feel physical sensations consistent with experiencing vaginal intercourse recently. (*Id.*) *See also Doe I*, 255 F. Supp. 3d at 1070. And she soon learned from a friend that Plaintiff had walked her home. *Id.* She also began hearing from others that they had heard Plaintiff bragging about having sex with her. *Id.* As for non-victim witnesses, six of them

> generally confirmed one or more of the following: that Jane Doe 1 had been intoxicated on the night in question; that she had left the Fraternity party with Plaintiff; that she believed she and Plaintiff had engaged in sexual intercourse that night, but she could not remember; that Plaintiff walked her home that night; that, soon after, Plaintiff had boasted about having sex with Jane Doe 1; and that Plaintiff, many months later, recounted to others that Jane Doe 1 had been telling Plaintiff on the night in question that she did not want to have sex, but he persisted.

*Id.* at 1070–71. (*See also* ECF No. 168 at 7–8, ¶¶ 11, 13, 15, 17, 18.)

Jane Doe 2 told Tracy-Ramirez that she was sober on the night in question and

5

"made it very clear" to Plaintiff "that she didn't want to have sex with him." (*Id.* at 8, ¶¶ 19–20.) There were no witnesses who could provide contemporaneous corroborating evidence, although Tracy-Ramirez interviewed other students to whom Jane Doe 2 had spoken about the incident. *See Doe I*, 255 F. Supp. 3d at 1071.

Plaintiff met with Tracy-Ramirez at least once, accompanied by an attorney. *Id.* at 1071–72. Through his attorney, he also communicated in writing on several occasions. *Id.* at 1072. These communications mostly comprised (i) direct denials of the specific accusations against him, although without providing supporting evidence or even another side of the story; and (ii) complaints about bias, a presumption of guilt, and lack of due process generally. *Id.* Plaintiff and his attorney were permitted to review the complete investigation file, including witness interview notes, before Tracy-Ramirez made her findings, but Plaintiff still stood on his denials and procedural complaints. *Id.* (*See also* ECF No. 168 at 9, ¶ 23.) Plaintiff could have offered his own version of events, explained why various witnesses should not be believed, supplied names of additional witnesses to interview, and requested that Tracy-Ramirez ask specific additional questions of the various witnesses, but he did none of these things. (*Id.* at 7–9, ¶¶ 10, 12, 14, 16, 22, 24–28.)

Tracy-Ramirez's final report was dated July 24, 2014. (ECF No. 168-4 at 2.) Tracy-Ramirez found Jane Doe 1, Jane Doe 2, and the witnesses credible. (*Id.* at 31–38.) She found Plaintiff not credible, largely based on contradictions between his claims and those made by multiple other witnesses. (*Id.* at 38–39.) Also, while stating that Plaintiff's choice "to provide brief written statements rather than participate in a substantive conversation about the allegations . . . d[id] not detract from his credibility,"

Tracy-Ramirez explained that "the absence of a substantive interview did deprive this investigator of the opportunity to ask detailed questions about [Plaintiff's] perspective and assess his level of forthrightness." (*Id.* at 38.) Ultimately, Tracy-Ramirez found it more likely than not that Plaintiff had engaged in nonconsensual sexual contact with both Jane Does 1 and 2, in violation of the University's student conduct code. (ECF No. 168 at 9, ¶ 31.)

The University's "Standing Review Committee reviewed and approved [these] findings." (*Id.* ¶ 32.) The University's assistant director in the Office of Student Conduct decided that two instances of nonconsensual sexual contact merited expulsion. (*Id.* at 10 ¶ 33.) Plaintiff was indeed expelled on August 24, 2014. (ECF No. 161 at 5, ¶ 15.) By then, he had been admitted to the Transfer University, from which he graduated with both an undergraduate and a master's degree in 2016. (ECF No. 168 at 6–7, ¶¶ 5–6.) But the University of Colorado has placed a permanent notation on his academic transcript stating that he violated the University's sexual conduct standards. *Doe I*, 255 F. Supp. 3d at 1073. As far as Plaintiff knows, the University has not yet disclosed this information to any third party. (ECF No. 168 at 6, ¶ 16.)

No party has stated or even suggested to the Court that anyone ever considered referring Plaintiff to law enforcement authorities for potential prosecution, or that Plaintiff has otherwise been investigated, charged, or prosecuted by the criminal authorities based on his alleged nonconsensual sexual contact with Jane Does 1 or 2.

## IV. ANALYSIS

As stated previously, Plaintiff's sole remaining claim is for violation of his right of procedural due process. The Fourteenth Amendment's Due Process Clause states,

"No state shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. A court must "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *see also Zwygart v. Bd. of Cnty. Comm'rs*, 483 F.3d 1086, 1093 (10th Cir. 2007).[2]

A.   **"Whether There Exists a Liberty or Property Interest Which Has Been Interfered with by the State"**

In resolving the first round of motions to dismiss, the Court found that Plaintiff possessed a property interest in his education at the University, considering that it is a public university. *Doe I*, 255 F. Supp. 3d at 1079. Defendant did not challenge this conclusion in his second motion to dismiss. *See Doe II*, 2018 WL 2096347, at *4. Finally, Defendant does not respond to Plaintiff's current argument that he had a property interest in his education at the University. (ECF No. 161 at 6–7.) The Court finds, therefore, that the University has conceded this element.

B.   **"Whether the Procedures Attendant upon That Deprivation Were Constitutionally Sufficient"**

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (alterations in original). To discern the procedural protections demanded by any particular situation, the Court must consider the following three factors:

- The interests of the individual in retaining their property and the injury

---

[2] Plaintiff may sue the University for a Fourteenth Amendment violation because it is an arm of the State of Colorado. *See* Colo. Const. art. VIII, §§ 1, 5.

> threatened by the official action;
> 
> - The risk of error through the procedures used and probable value, if any, of additional or substitute procedural safeguards; and
> 
> - The costs and administrative burden of the additional process, and the interests of the government in efficient adjudication.

*Id.* at 335.

Plaintiff's primary argument attempts to shoehorn a Fifth Amendment self-incrimination aspect into these factors. He first quotes the factors, but before applying any of them, he argues that the University's investigation process is inherently flawed because it supposedly penalizes those under investigation for standing on their Fifth Amendment right against self-incrimination. (ECF No. 161 at 7–11.) He follows this with a discussion of the first *Mathews v. Eldridge* factor (significance of the individual's property interest), linking it to his interest in completing his education and preserving the integrity of his educational record. (*Id.* at 11–12.) He then addresses the second *Mathews v. Eldridge* factor (risk of error through the procedures used, and value additional procedures), but this turns out to be a brief recapitulation of the self-incrimination argument, concluding with the declaration that the University's "Title IX investigation process is fatally flawed through its coercion of accused students into waiving protected Fifth Amendment rights." (*Id.* at 12–13.)

Next, Plaintiff presents an alternative risk-of-error argument, claiming that the process should have at least ensured an impartial adjudicator, an opportunity for cross-examination, exclusion of hearsay, and prevention of "consolidation of cases" (never explained, but perhaps referring to the fact that the accusations by Jane Does 1 and 2

were investigated mostly simultaneously, and resolved simultaneously). (*Id.* at 13–15.) Finally, and nominally in the context of addressing the third *Mathews v. Eldridge* factor (burden on the government of additional procedure), Plaintiff argues that the University's investigative process creates the threat of "constructive double jeopardy" for accused students, and he asserts that "the government's interest in efficient adjudication of these types of investigations would be best served by universities acknowledging the inherent coercive nature of their policies and returning these investigations to the criminal justice system." (*Id.* at 15–16.) Plaintiff concludes by stating that the University's "Title IX sexual misconduct investigation policy . . . facially fails to protect accused students' due process rights," and that it also failed as applied to Plaintiff's investigation given Tracy-Ramirez's supposed "open acknowledgment of negative inferences from [his] choice to prioritize protection of his Fifth Amendment rights" and "the undisputed lack of a hearing." (*Id.* at 16.)

So, the progression of Plaintiff's arguments is somewhat haphazard and, as it turns out, these arguments tend to bleed into each other more than already described. The Court will nonetheless attempt to address these issues in the order presented (although the Court need not address the first *Mathews v. Eldridge* factor, because Defendant never responds to Plaintiff's argument in that regard).

    1.    <u>The Choice Between Participating in the Investigation and Potential Self-Incrimination</u>

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (internal quotation marks omitted). The Court pointed out in *Doe II* that, on the allegations presented, this case raised "an important question whether Plaintiff essentially rejected

10

his 'opportunity to be heard' during the investigation process because he apparently chose to stand on procedural objections rather than offering his own side of the story." 2018 WL 2096347, at *9 n.5. The facts, as established for summary judgment purposes, emphasize this question. Apart from choosing not to offer his side of the story, Plaintiff chose not to name additional witnesses, to provide information about credibility of witnesses, or to give Tracy-Ramirez questions to ask witnesses. (ECF No. 168 at 9, ¶¶ 24–28.)

Likely sensing the incongruity between choosing not to participate in the University's process and claiming a procedural due process violation, Plaintiff primarily argues that the circumstances forced him into an unconstitutional choice between participating in the University's process or preserving his Fifth Amendment right against self-incrimination. (ECF No. 161 at 8–11.)[3] Plaintiff cites to cases in which the Supreme Court held that it was unconstitutional, even outside a criminal trial, to compel a person to testify against him- or herself through threats of immediate consequences, such as termination of employment or an automatic presumption of liability. *See, e.g.*, *Lefkowitz v. Cunningham*, 431 U.S. 801, 804–09 (1977) (officer of political party subject to a subpoena was forced into an unconstitutional choice when the penalty for invoking the Fifth Amendment was automatic divestiture of party office and a ban on holding any public or party office for five years); *Gardner v. Broderick*, 392 U.S. 273, 278–79 (1968) (police officer summoned before a grand jury was forced into an unconstitutional choice when the official penalty for refusing to waive his Fifth Amendment right was immediate dismissal from the police force). The problem, in Plaintiff's view, is that he was being

---

[3] Plaintiff describes his non-participation as a "de facto assertion of his Fifth Amendment rights." (*Id.* at 2.)

11

investigated for conduct that could be charged by the criminal authorities as a felony, so the University's "investigation process is facially coercive" because it forces him to choose between, on the one hand, standing on his Fifth Amendment right to remain silent and therefore not fully participating in the University investigation while preserving his options in a later criminal case, or, on the other hand, waiving his Fifth Amendment right and fully participating in the University investigation but also risking prejudice to himself in a later criminal case. (ECF No. 161 at 11.)

Plaintiff also includes a few glancing cites to *Baxter v. Palmigiano*, 425 U.S. 308 (1976), and is therefore presumably aware of its endorsement of the principle that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Id.* at 318. Plaintiff's awareness of this holding is confirmed by a paragraph sandwiched between accusations of unconstitutional coercion, where he apparently accuses the University of a discrete procedural due process violation because there was "no judicial officer to adjudicate the proper inferences from [his] choice to remain silent" and "[n]o official position . . . published or stated [by the University] defining what inferences would be made based on a defendant's silence under the Fifth Amendment." (ECF No. 161 at 10.)

This argument—a purported need for official guidance on inferences an investigator can draw from a choice to remain silent—is really an argument under the second *Mathews v. Eldridge* factor that the procedures used created a risk of error. Plaintiff's argument fails for multiple reasons.

First, this argument turns on a factual premise, namely, that Plaintiff was indeed

12

standing on his Fifth Amendment right against self-incrimination. Plaintiff has not presented the Court with any evidence of that. By way of argument, he says that he made a "de facto assertion of his Fifth Amendment rights" (ECF No. 161 at 2) and in his statements of fact he asserts that his participation in the University investigation was "limited" due to, in part, "his then-counsel's advice to protect [his] rights" (*id.* at 4, ¶ 12), but he offers no evidence to support his claim that he received such advice, much less the content of that advice. Moreover, Tracy-Ramirez's report says that Plaintiff made rather specific written denials, such as: "To begin, it is not true that on or about August 31, 2013[,] I attended a party that began on [a certain fraternity's] property where alcohol was served." (ECF No. 168-4 at 38.) *See also Doe I*, 255 F. Supp. 3d at 1072 (quoting additional similar denials of specific accusations). Thus, there is evidence from which a reasonable factfinder could conclude that Plaintiff did not choose to remain silent, but affirmatively stated that he did not do any of the specific things with which he was accused. And if a reasonable factfinder were to conclude that he never invoked his right to remain silent, even in a "de facto" manner, the factual premise for his argument would evaporate.

Second, and closely related to the foregoing, what Plaintiff really seems to be complaining about is *not* inferences from *silence*, but inferences from refusal to provide any support for his denials. Specifically denying, for example, that you attended a party on August 31, 2013, is significantly different from refusing to say *whether* you attended a party on August 31, 2013. A specific denial naturally leads one to ask, "If you were not there, then where were you?", whereas such a question is one step ahead of the facts if the party has yet to confirm or deny the accusation. Thus, if an accused party

13

answers a specific accusation with a specific denial but offers no detail, it is a fair inference—and a completely constitutional one, even in a criminal trial—that the party has no detail to offer. Thus, again, Plaintiff has not established a basic premise of his argument.

Third, even if Plaintiff had assembled a factual record to support his claim that he was standing on his Fifth Amendment rights, and even if that factual record was so overwhelming that a factfinder could only decide in his favor, he has still not presented a factual record—much less a factual record that could lead a reasonable factfinder to resolve the issue only one way—that Tracy-Ramirez *understood* that Plaintiff was standing on his Fifth Amendment right to remain silent. If she did not understand him to be doing so, then lack of official guidance on how to interpret Fifth Amendment silence is a moot point.

Fourth, even if Plaintiff cured the previous deficiencies, he has again failed to assemble a necessary factual record, namely, that Tracy-Ramirez drew any negative inferences based on his alleged silence. Her report specifically says that she did not. She says, rather, that she found Plaintiff's denials not credible in light of other witness's accounts. (ECF No. 168-4 at 38–39.) Just because Tracy-Ramirez said as much does not mean it is true, but it is at least evidence from which a reasonable factfinder could conclude that she made no negative inferences based on Plaintiff's alleged silence. And if a factfinder were to decide that she made no negative inferences, the question of whether she needed official guidance on negative inferences is moot.

Finally, Plaintiff is not entitled to summary judgment because his theory simply lacks legal support. He cites none, and the Court is aware of none. What authority the

Court could find strongly suggests that there would have been no constitutional violation even if Plaintiff had been simultaneously under indictment for his alleged misdeeds:

> Not only is it permissible to conduct a civil [administrative] proceeding at the same time as a related criminal proceeding, even if that necessitates invocation of the Fifth Amendment privilege, but it is even permissible for the trier of fact to draw adverse inferences from the invocation of the Fifth Amendment in a civil [administrative] proceeding.

*MacKay v. DEA*, 664 F.3d 808, 820 (10th Cir. 2011) (quoting *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 326 (9th Cir.1995)).[4] In addition, Plaintiff cites no authority (and the Court could find none) that due process ever requires official instruction on what inferences one may draw from a party's invocation of the Fifth Amendment.[5]

For all these reasons, Plaintiff is not entitled to summary judgment on the theory that he was unconstitutionally forced to choose between participating in the University investigation and protecting his Fifth Amendment right to remain silent.

2. Additional Procedural Protections (*Mathews v. Eldridge* factor two)

"[D]ue process . . . calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334. It is the plaintiff's burden to specify and justify

---

[4] A few cases discuss whether the accused in administrative proceedings has a right to the presence of an attorney to provide advice about whether to invoke the Fifth Amendment. *See Gabrilowitz v. Newman*, 582 F.2d 100, 104–07 (1st Cir. 1978); *Salau v. Denton*, 139 F. Supp. 3d 989, 1008 (W.D. Mo. 2015); *Donohue v. Baker*, 976 F.Supp. 136, 146 (N.D.N.Y. 1997). But that is a very different question from whether it is constitutional to put someone to the choice between participating in the investigation or invoking the Fifth Amendment.

[5] *Baxter* and other cases suggest that a factfinder may not find fault, liability, or guilt based *only* on the accused's silence. *See Baxter*, 425 U.S. at 317–19; *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000); *United States v. Stelmokas*, 100 F.3d 302, 311 (3d Cir. 1996); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995). Plaintiff has not asserted that Tracy-Ramirez committed such an error and he would not be entitled to summary judgment on such a theory in any event. There is ample evidence from which a factfinder could conclude that she based her findings and conclusions on far more than Plaintiff's alleged silence.

the minimum amount of process that the government could have provided him to constitutionally support the same result it actually reached.[6]

Plaintiff argues "in the alternative" that the risk of erroneous deprivation was unconstitutionally high given the lack of "a hearing" (meaning a live, adversarial hearing) with an impartial adjudicator, cross-examination, exclusion of hearsay, and no "consolidation of cases." (ECF No. 161 at 13–15.) The Court presumes this argument is "alternative" in the sense that, regardless of any choice to stand on Fifth Amendment rights or not, the University's disciplinary process failed to provide adequate procedural protections to Plaintiff because he was accused of misconduct that could also be charged as a felony.[7]

The Court's task at this phase is to consider the risk of error through the procedures used and probable value, if any, of additional or substitute procedural safeguards. *Mathews*, 424 U.S. at 335. But Plaintiff has once again failed to assemble a record sufficient to justify these inquiries.

Concerning Plaintiff's request for an impartial adjudicator, the Court does not doubt that an impartial adjudicator is probably a *sine qua non* of due process, *see, e.g.*, *Marshall v. Jerrico*, Inc., 446 U.S. 238, 242 (1980). But Plaintiff's demand for an impartial adjudicator at a live hearing is not ripe until he can prove that Tracy-Ramirez was biased toward him. Or in other words, it is pointless to consider the costs and

---

[6] If the plaintiff claims that no amount of process could permit the government to reach the result it actually reached, the plaintiff is claiming a violation of substantive, not procedural, due process. *See, e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998).

[7] Plaintiff does not argue that the preponderance-of-the-evidence standard is too low under the circumstances. *Cf. Doe I*, 255 F. Supp. 3d at 1082 n.13; *Doe II*, 2018 WL 2096347, at *6.

benefits of requiring an impartial adjudicator at a live hearing if, under the circumstances, the accused was investigated and adjudged impartially without a live hearing. Moreover, in the current summary judgment posture, Plaintiff would need to present evidence so overwhelming that a reasonable factfinder could only conclude that Tracy-Ramirez was biased toward him. Because Plaintiff has not done so, there is no occasion for the Court to consider the value of an impartial adjudicator at a live hearing.

Concerning Plaintiff's requirement that a hearing exclude hearsay, the problem is similar: he has not made any attempt to show that Tracy-Ramirez's conclusions would have been different had she not relied on hearsay. This is particularly striking in the case of Jane Doe 2, whose testimony is *not* based on hearsay, and who reported that Plaintiff ignored her fully sober refusals to have sex with him. But even as to Jane Doe 1, the non-hearsay evidence included:

- Jane Doe 1's memory of briefly awaking naked in someone else's bed on the night in question, and then, the next morning, feeling physical sensations of recent vaginal penetration (ECF No. 168 at 7, ¶ 9);
- an eyewitness who saw Plaintiff and Jane Doe 1 make out and then leave a party together on the night in question, and who also witnessed Jane Doe 1's level of intoxication (ECF No. 168-4 at 26);
- an eyewitness who saw Jane Doe 1 come out of Plaintiff's bedroom on the night in question, looking confused and asking for Plaintiff, after which Plaintiff returned and walked Jane Doe 1 home (Jane Doe 1 does not remember this) (*id.* at 15); and
- at least two witnesses who heard Plaintiff say, directly to them, that he had

17

>had sex with Jane Doe 1 on the night in question, despite her protests (ECF No. 168 at 7–8, ¶¶ 11, 15).[8]

Thus, there is sufficient evidence to conclude that Tracy-Ramirez would have reached the same conclusion regardless of hearsay.

Concerning Plaintiff's requirement that there be no "consolidation of cases" (ECF No. 161 at 15), he does not develop this argument and it is therefore deemed forfeited at this phase. *See, e.g., United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013); *United States v. Martinez*, 518 F.3d 763, 768 (10th Cir. 2008). In any event, if he means analogize to the "spillover effect" (the prejudice that co-defendants often claim when going to trial together, *see, e.g., United States v. Morales*, 108 F.3d 1213, 1219 (10th Cir. 1997)), he fails to recognize that avoiding "spillover" in this case would require assigning separate investigators to Jane Doe 1 and 2, and separate boards of review. Because he fails to recognize this, by definition he makes no argument why due process requires as much.

Finally, concerning Plaintiff's request for an opportunity for cross-examination, the Court understands the power of cross-examination in "he said, she said" cases. But only the Jane Doe 2 accusation was a pure "he said, she said" dispute. In any event, because Plaintiff (a) claims that the minimum process to which he was entitled was a live hearing that included an impartial adjudicator, exclusion of hearsay, no consolidation, and an opportunity to cross-examine, and (b) has failed to establish factual predicates for considering at least three of those four, it is pointless for the Court to consider whether the lack of an opportunity for cross-examination, standing alone,

---

[8] Prior inconsistent statements of a party to the proceeding are not hearsay. Fed. R. Evid. 801(d)(1).

violated Plaintiff's procedural due process rights.

For all these reasons, Plaintiff is not entitled to summary judgment on his alternative procedural due process argument.

### 3. "Constructive Double Jeopardy"

Finally, Plaintiff asserts the "constructive double jeopardy aspect of university Title IX investigations into alleged conduct that has felony criminal jeopardy." (ECF No. 161 at 15–16.) Plaintiff entirely fails to develop the notion of "constructive double jeopardy," and it is logical nonsense in any event. One cannot claim double jeopardy at the initial phase. The argument is therefore rejected, for this and many other potential reasons.

### C. Final Remarks

The nature of Plaintiff's motion causes the Court to question whether there is really anything to resolve at trial next month. But the Court will presume that Plaintiff is holding back arguments that he acknowledges must turn on resolutions of disputed facts. Or in other words, the Court will presume that Plaintiff will not take this case to trial without a good faith belief that factual disputes remain, that evidence exists from which a factfinder can rule in his favor, and that if a factfinder ruled in his favor on those disputes, it would be sufficient to hold that the University violated Plaintiff's procedural due process rights.

Moreover, from a more practical perspective, Plaintiff transferred to a different university without having to disclose the University's investigation or its outcome, and Plaintiff graduated from the Transfer University three years ago. Neither Plaintiff nor Defendant has made the Court aware of any circumstance in which there remains a likelihood that the University of Colorado will disclose Plaintiff's transcript. Thus, the

stakes are low and this case may be ripe for settlement. The parties are strongly encouraged to consider moving for a settlement conference before the magistrate judge, or hiring a private mediator. Given that trial is imminent, the parties should undertake these efforts promptly.

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Plaintiff's Motion for Summary Judgment (ECF No. 112) is DENIED; and

2. This case REMAINS SET for a Final Trial Preparation Conference on July 8, 2019, at 11:00 AM, and a three-day bench trial to begin on July 22, 2019, at 8:30 AM, both in Courtroom A801.

Dated this 5th day of June, 2018.

BY THE COURT:

_____
William J. Martinez
United States District Judge